If you may please the Court, my name is Kevin Ashby with Milbank Tweed. I have the McCloy on behalf of Petitioner Appellant Leda Cuellar. If I may, I would like to reserve three minutes for rebuttal. The principal question on this appeal is whether or not there is a legitimate basis under the Hague Convention on Civil Aspects of Child Abduction to refuse to return to Panama a child who was born in Panama and who lived in Panama with her mother until her wrongful abduction from Respondent Richard Joyce. Mr. Joyce This is an unusual case, as Hague Convention cases go, in that the mother is actually physically in the United States right now. She is, Your Honor. And just so I understand She's here to get her child back. I'm not blaming anybody. I'm just trying to find out the facts. If you prevail, we wouldn't send the child back to Panama. We would hand it over to the mother here, right? I'm trying to figure out what the remedy Usually what happens is that one parent is physically here and one parent is physically in Israel or whatever country. What would be the remedy here? The remedy would be to return the child immediately to Panama, and Ms. Cuellar would accompany the child on a plane as soon as that is ordered. Because sending a little kid to Absolutely. So the mother is prepared to go back to Panama and wants to go back to Panama. Absolutely. There is no question about that. She does not want to stay here. No, absolutely not. She is here to get her child back. She's here on a tourist visa. Does she even have legal status here in the country? Yes, she is on a tourist visa. She applied for an extension of that visa. She was granted an extension of this visa specifically to finish litigating this case. Exactly. Although she is still the wife of a United States citizen and the mother of a United States citizen, and could obtain, I mean, from my knowledge of immigration law, that if she wanted to stay as the immediate relative of a U.S. citizen, of two U.S. citizens in fact, she could probably change her status pretty much on demand. Your Honor, I'm not familiar with the immigration law in that respect, but my understanding is that you need the consent and cooperation of her husband. And I do not believe at this point that Mr. Joyce is willing to sponsor her for a green card. And in any event, she has no desire to immigrate to this country. She would not want that. No, absolutely not. She wants to go back to Panama. Absolutely. I mean, I cannot state this more unequivocally. She is here solely to get her child back. And the instant that an order comes down to have the child returned to Panama, she will return with the child. Mr. Joyce claims that there is no need to return the child on the basis of the grave risk of harm exception. And in support of that claim, he cites to the child's emotional attachment to him, that Cuellar is an unfit mother, and that Panama is simply a too poor, uncivilized, and corrupt country to raise a child. These considerations are per se impermissible and fall woefully short of the grave risk of harm exception as it is being pronounced not only by this Court, but by every federal court of appeals that has considered the exception. The district court below committed reversible error in finding that these impermissible considerations amounted to clear and convincing evidence of grave risk of harm. And in so doing, the district court ignored the strong presumption under the Convention of returning the parties to the pre-abduction status quo and permitting the home country to determine matters of custody. And, in fact, the district court did this even though the court in Panama issued a letter to the district court's attention explaining that court's obligation under Panamanian law to decide custody in the best interests of the child. Now, what precludes the Panamanian court from deciding custody with the child here? Do they have to have physical possession, so to speak, of the body? I don't know anything about family law. My understanding, and it comes from the letter that the Panamanian court issued, is that they do require physical custody of the child as the judge, the Panamanian judge said that was necessary to undertake a sociological evaluation and to provide services. And it's my understanding that the Panamanian proceedings essentially stayed prior to or until the child is returned to Panama. And there are no custody proceedings going on in the United States, I gather. There are, yes. There are. Mr. Joyce, following the district court's decision, Mr. Joyce commenced a custody proceeding in state court in Montana. We moved to stay that proceeding. And with Mr. Joyce's consent, he agreed to that. And so there is a pending open custody proceeding in state court in Montana, but it stayed pending the decision of this court. Okay. Nothing going on in Florida or anything like that? Well, there is no custody. There's no custody proceeding. There is a criminal matter in Florida. The restraining order is in Florida. I'm sorry, Your Honor? And the restraining order. Yes. There is a restraining order issued by the criminal court in that action in Florida which required Mr. Joyce to have no contact with QAILAR. What happened to the case in New Jersey? My understanding is that the district judge in New Jersey immediately issued a restraining order, an order to bring before him the child. The order was not served on Mr. Joyce. He had left the State prior to service. Is that case still pending, though? No. My understanding is that because service was not affected, it essentially meant that the order in the case was a nullity. Let me ask you, you know, these cases, sometimes they take years, unfortunately, to resolve. And I know under the Convention, the Convention urges the participating States to decide these cases as quickly as possible. That's right, Your Honor. In fact, Article 11 of the Convention sets an aspiration of six weeks to finish these types of cases. Yes. Quite an aspiration. Yes. Absolutely. Is it ever appropriate in these proceedings for the district court judge to consider the child's, you know, adjustment to the new living arrangement? No. I mean, this Court has held squarely under Asbestos a few months ago that those types of adjustment problems are per se impermissible as a matter of law. And that makes complete sense. An abductor should not be rewarded for his wrongful conduct by taking a child out of her home country, placing her in nuked surroundings, and then claiming that the child will be harmed by removing her from those surroundings. And I think you'll see that the courts, the federal courts are consistent in that regard. And prior to Asbestos, the Friedrich Court made a very compelling argument as to why that should be the case. So, you know, certainly that's not the case. Even under an understanding of what grave risk amounts to, while there may be psychological or emotional concerns, for lack of a better word, those do not amount to a grave risk, even prior to this Court's holding of Asbestos. But Asbestos, you know, and this is the heart of this case. If you look at the district court's opinion and you look at the brief of Mr. Joyce, in fact, he contends that this is the most significant evidence of grave risk of harm. Well, that's out the window following Asbestos. And so what are you left with in this case? You are left with a single accidental fall. You are left with claims of malnourishment which are based on Mr. Joyce's occasional observations that the child looked thin. And you are left with a claim that the child had a minor superficial burn on her and Mr. Joyce never obtained medical treatment for that alleged burn. He didn't even notice it until following the abduction and his arrival in Florida. And Mr. Gilead, his own expert who observed the child for these proceedings, testified she didn't see any signs, any scarring or long-term signs of these burns. So what this case boils down to is a finding of grave risk of harm on a single accident and a superficial minor injury in which there is not a scintilla of evidence of abuse or mistreatment. There is not a single case decided on grave risk of harm, or there's not even an example in the literature that finds grave risk of harm where there is an absence of intentional or malicious mistreatment of a child. The exemplars of grave risk are sexual and physical abuse. This case is unprecedented and it would make a mockery of the Hay Convention to think that Panama and the United States and all of the other contracting nations intended to condone child abduction and to deprive a home country of its rightful jurisdiction on the basis of reasons as flimsy as a single accident, a minor burn that can't be explained, or that the home country is uncivilized, corrupt, and is simply too poor a place. This decision was wrong as a matter of law. It's unprecedented. It creates a gross expansion of the grave risk of harm exception that swallows the rule that the home country should decide the merits of custody and it should be reversed. I would like to reserve my time for rebuttal, if I may, unless you have any other questions. Okay. Thank you. Thank you. Thank you. Good morning, and please, the Court. Ron Waterman on behalf of Mr. Joyce. I think that, obviously, the issue here is the grave danger. I don't believe that the judge did quite exactly what counsel has argued. I think that what the judge did was look at, I would call the totality of the circumstances at a hearing in December where the judge was able to evaluate the testimony of both parties. And admittedly, the grave danger cases focus on a variety of circumstances, but I believe that under those circumstances, the judge properly evaluated all of the circumstances that was before the court. Counsel makes, if you will, light of, almost, or tries to minimize the significance of what happened to this child while the child was living not just in Panama, but in a particular aspect of Panama, which was devoid of circumstances, devoid of services, and basically a barrio beyond. Why does that place her in a grave risk of danger? Your Honor, it does. I mean, you go out here, there's a barrio all over the place. Your Honor, there are. I think you have to look at exactly how this child has been impacted. Living in poverty by itself is not a factor, if you will, that exclusively can do that. But you have to look at the circumstances to how the child was living at the time and what the impact was. The Hague Convention talks about grave risk. So why doesn't he go down to Panama and make those arguments to the court that has jurisdiction? Your Honor, I think the question is whether or not he has to do that. Well, that is the question. And the Hague Convention and the jurisprudence is quite clear that abduction to change venue on custody is not appropriate. And that's exactly what happened here. And let me just throw into the mix, we see tons of cases where people are being deported from this country, where the hardship argument that is made to the Immigration Service is that they will go back to a poor country like Mexico. I haven't seen Panama, but I think Panama actually has a fairly high level of income. But in any event, the immigration authorities routinely deny those claims of hardship, and we have no jurisdiction even to turn those over. And I can, you know, from my own personal experience, the record here is not any better in terms of, or worse, perhaps, in terms of the risks to the child than we see there. So I'm just wondering what your standard is. Totality of the circumstance has this child who's been taken from her mother, and nobody's disputing this, the appropriate last family residence, you know, that she was abducted by a ruse apparently, and now the district court's relying on the fact that she, well, she speaks English and she's adjusted to the United States, and that what's at stake is sending her back to a poor area of Panama where the mother has said that she's not going to actually be living there. Those latter issues to me speak to, and the concerns, I don't minimize the concerns to the welfare of the child, but the appropriate custodial court to make that decision would seem to be the Panamanian court, not some court sitting in Montana. Your Honor, with all due respect, I think that the way the Hague Convention is set up is that unlike those issues relative to deportation, because I believe, because it is a child that's involved, the courts in the United States or the court where the abductor starts the proceeding, that's not the case here. This is a very unusual case factually, as Justice Kaczynski already pointed out. This is not a case, for example, where an action was started in the United States until after the district court ruled that the child did not have to go back. There was no action started by my client in the United States. This is not one of those cases where you see these competing actions in two separate countries arguing over those issues one way or another. My client didn't start a matter here. But going back to the Hague Convention, Your Honor, I hear what you're saying, but the grave risk language has to have meaning. And I think it has meaning as I read the cases. Well, it does have to have meaning, but we look through the case law and the cases. What case comes anywhere factually close to this? Your Honor, I think each of these cases stand almost uniquely on their own facts. You say it has to have meaning. I understand the immigration context is different, but there are children involved in those, too. Oftentimes there are. Most of the times there are. And the problem is this case would set a very low bar, it seems to me, for what grave risk of harm means. Doesn't the State Department, as counsel say, talk about sexual abuse and risk of physical battery? It would set up to that kind of severity. I believe, Your Honor, that it looks to, again, I think each of those cases, I read these cases as almost each of them are standing on their own. And here we have something, most of those cases, most of these cases, talk about What do you have here? Excuse me, Your Honor. What do you have here? What we have here is, and I think it's what the district court found, what we have here is a set of circumstances. We're dealing with a child. Tell me facts. What is it you have here that shows abuse of any kind, much less a danger of any kind, much less grave danger? Very well. What we have are the injuries. We do have the evidence of malnourishment. We have the burns. What evidence of malnourishment do you have? We have a statement from a nurse. You mean his sister? Yes. She was still a nurse. Please. You know, we have doctors in this country. You don't even have a certificate from a doctor. You have an interested party who is not even a doctor. She qualifies as an expert. What tests did she perform on the child to show malnourishment? Your Honor, I don't know what tests she performed. I know what opinion she offered. Mr. Wertheimer, that's nothing. She didn't offer it. Actually, it was hearsay. That's nothing. Okay. Now, let's move on. What else you got? We have the evidence. His sister says the kid looks thin. You can say malnourished is a medical concept. It's something that can be tested. It can be, you know, somebody could do it, an expert, a medical professional, a doctor, could do an examination, could give tests. The fact that his sister thinks the kid is thin, I'm sorry, that's nothing. What else you got? We have burns. We have testimony. What do you know about the burns? We don't know the... Children get burned. Children get burned. Any indication that the burns are as a result of abuse or neglect? Your Honor, I believe that the totality of the evidence... Answer my question. Is there any evidence that the burns are the result of abuse or neglect? My answer is yes, Your Honor. There is, and it is in the totality of the evidence that you look to. And I think that's what the Court did. Your Honor, stuff like that is not going to cut any ice with me. Evidence means evidence. Saying totality of circumstances is as good as saying nothing at all. Your Honor... What do you have that shows the source of the burns as being abuse or neglect? We do not... An eyewitness? We do not have an eyewitness. An expert that looked at the burns and said, These are burns that look to me like they're caused by intentional infliction of an injury? No, and, Your Honor, in this case... What do you have? Do you have a police report from Panama saying the child was injured by burning and were taken away from the mother or anything like that? No, Your Honor, we do not have that. Anything about the circumstances of the burns? We do not have anything about the circumstances. You've got nothing there. What else have you got? We have the fall. We have the injury to the child's head from a fall. Any evidence that the fall was intentional or negligent or as a result of neglect? Evidence, I believe, that can be drawn that the fall was a result of at least neglect. How do you do that? What do you have supporting that? The testimony was that this is a child who was left on an elevated porch without any surrounding area in a wheeled cart. She rolled over the edge of that and fell somewhere between 3 and 7 feet, one or the other. She hit her head. She was taken to a doctor. She was X-rayed. Who has evidence that she hit her head? Where does that evidence come from? The evidence comes from the testimony of the mother, although the evidence is inconsistent. Who took her to the doctor? Your Honor, I believe the mother took her to the doctor. Well, that sounds like a normal parental reaction. It doesn't sound like she's being neglectful. She may have lost sight of the girl. So you're saying that's grave risk of harm because there was an accident? Your Honor, the... And the mother took her to the hospital. The mother took her to the hospital. What we also have is a variety of, if you will, and I think it was part of what the judge did, he listened to the mother's testimony, which was full of, if you will, what I would call surrounding and confusing denials about exactly what happened, that the child was injured, that the child needed an X-ray, that an X-ray showed some injuries, that the child wasn't injured, that the child's gait, which is obviously compromised and being treated, always walked that way, that there was nothing wrong with the child. And I think it was that confusion of a mother saying basically there's no clearer explanation as to what transpired. The X-ray was described as something that they did, but there was really no injury. There was no reason to take the child. They just did that. And I think it is that... I don't understand what you find strange about that. Lots of tests administered. It turned out to prove to be, to have been unnecessary, but they are taken just because tests, X-rays and the like, check for possible problems. I don't understand what you find strange about that, what you would find strange about that. Yeah, if... If we said that every child that got injured and then taken or had an accident wasn't taken to a doctor and found to be okay, then becomes in grave danger, I don't think any of us would get to keep our kids for very long. Your Honor, I would beg to differ. That if what you did was say, I don't know, the child fell, the child wasn't injured, the child was injured, the child had an injury to their head, the child was all right, the child walks with a gait that everybody says is obviously compromised. And it is... Who's everybody? Who's everybody? The everybody that has seen and witnessed that is, first, the father. Second, the therapist who reviewed the child and witnessed her as she was making an evaluation of how the child was attached to the father one way or another. I'm sorry, she's an expert in gait? She is not an expert in gait. Okay, so what does that do you? It is an observation of a third party as to what the child's status was as she saw that child immediately before this hearing relative to the child's compromised gait. Because it contrasts, Your Honor, what the mother is saying, which is both that the child was injured and not injured, may have a compromised gait, may not be compromised one way or another. Has your client offered to sponsor the mother for permanent residence in this country? I mean, she wants to keep the child here. I'm not sure. We've been told she's not willing, but has your client offered that as an alternative? Your Honor, that is an alternative that my client is willing to pursue and willing to discuss. Did you hear my question? I thought I did, Your Honor. I thought you asked whether or not there was an option of sponsoring. The word was offered. Offered. Yes. Has he said, look, in order for you not to go back to Panama or take the child back to Panama, I will sponsor. I mean, they're still married, right? This was a real marriage. That's correct, Your Honor. They had a child of the marriage. Has he offered to sponsor her to stay here? Your Honor, I don't think that's an option. I can't tell you whether or not there is an option. And perhaps, I mean, she may not be willing to abstract, but perhaps if it's offered, she'd be willing to do that. Your Honor, my client had offered that to Ms. Selyar, both a number of years ago and after this matter arose. And I believe the record This is before the abduction or after? Excuse me? Before the abduction or after the abduction? On both sides, Your Honor. I believe the record shows, I believe that that offer still stood during the time we tried this matter before Judge Siebel last December, that he affirmed that he would be willing to sponsor her to stay in the United States for the benefit of this child. And that offer was extended previously. As a matter of fact, as my understanding of the record, it is that they had discussed the fact that they would bring this child to the United States at some time, recognizing Why is she not allowing the mother to see the child? Excuse? Why is she not allowing the mother to see the child? At the present time, Your Honor, the mother is in Florida and my client and the child are in Montana. So if she were to travel to Montana, she'd be allowed to see the child? Your Honor, we have been negotiating back and forth relative to a series of understandings as to how Just call for a simple yes or no answer. If she comes to Montana, she's allowed to see the child. The answer is yes, Your Honor. And as a matter of fact, after this hearing and after the court's ruling, the mother came to Montana and saw the child continuously throughout the spring and early summer of 2009. And then what happened? The father, his position at the Montana Tech in Butte ended. He took a leave to look for other positions. He took the child to Florida. The mother followed the Florida. The mother saw the child in Florida throughout. We have what I would call a circumstance that arose sometime in late July or early August as the father was intending to come back. Is this where he got arrested? This is when he was arrested. You call it a circumstance? Well, Your Honor, I don't know exactly the full set of You call it a crime when somebody gets arrested and convicted. You know, this is what we call the federal court. They call it something else in Montana? No, Your Honor. They call it a crime if, in fact, a person has been charged and convicted. He wasn't convicted? He was not. He was just arrested. Excuse me? He was just arrested. He was arrested. And there's a stay-away order. There was a I thought he had introduced a trespasser. He was convicted. No, he was not, Your Honor. He's been charged. He's been charged. The criminal count, and that's why, with all due respect, why I said that the way I did was because there were several matters that arose from this incident in Florida. There was an arrest. Initially, he was charged with several felonies. Those have been reduced now to a single misdemeanor, and that matter is still pending. It has not been adjudicated. There was also a domestic relations charge filed by Ms. Saliar against my client. That matter has been voluntarily dismissed by the appellant in this matter. So as a consequence, I'm not clear exactly of all of the circumstances. So, yes, under those circumstances, I do call this an incident rather than a crime, because I don't know what the outcome is. Where's the child today? Today? Where's the father today? The child is in Butte, Montana. The father is in Butte, Montana. And where's the mother? The mother is in Florida. When's the last time the mother saw the child? The mother saw the child, I believe it was in August, Your Honor. There was a matter pending before the court as to whether or not my client could leave Florida and whether or not the child would go with him or stay in Florida. The court concluded that the child could go with my client to Montana, and the child traveled there. Since then, the parties have been able to arrange for telephonic communication so that the mother calls just about every day and speaks to the child either in the morning and in the afternoon. We have been negotiating an agreement so that we would have a defined schedule so that the mother would see the child if the mother relocated to Montana. And we have been negotiating over that, and that's the subject of yet a motion that is also pending before this Court. Is this a case that has any susceptibility to mediation? Is there or are the negotiations just normal lawyer-to-lawyer type at the moment? Your Honor, the mediation unit of this Court might prove to be helpful in this case. Judge Kaczynski's question about whether or not there was an offer to sponsor the mother to stay in the United States is something that I think would be worthwhile addressing. And likewise, I think even if not addressing that, resolving these two sets of what I'm calling competing temporary parenting plans to merge them into one would be a device that would be a method through which we could resolve potentially those two issues. If the mother concluded to stay in the United States, of course, that would moot this proceeding. Okay. I'll relay the question. Does the child have a U.S. passport? Excuse me? Does the child have a U.S. passport? The child has both a Panamanian and a United States passport because the child is entitled to both. Right. I was just wondering how he got her into the country from Australia. Is she on her U.S. passport? Your Honor, I believe that the mother had brought both passports with the child, as I understand the circumstances that happened in Australia, and the father had those documents in his possession as he traveled back to the United States with the child. He left her passport at the gate? At the gate, Your Honor. At the gate. Yes. He's shown as a father in her passport. I'm just wondering, usually they don't let you travel with a child unless you can show that. No, he's listed. They don't let you bring it across international borders. He has always acknowledged that there's not an issue of paternity here, Your Honor. My client has always been. It's not just paternity. If you're a noncustodial parent, you can't move a child. I mean, if you're an American couple in the United States, if you're not the custodial parent, you can't just take the kid out. I understand that. And living in Montana, these are the border situations. I know that quite well. It happens all the time, right? Right. It does. And oftentimes when there's a dissolution of the marriage, you have to show that you're entitled to custody. In this instance, the parties were married. He was listed as the father on the travel documents, and he cleared customs in Australia. I will honestly tell you I don't know the details as to how he did that, save and except that he had travel documents that showed his ---- He cleared the U.S. customs in Australia? Well, he cleared ---- he got on the plane in Australia with the child and with those travel documents and came to the United States. So he had to clear customs here again? Yes, and then clear customs here. Unlike Vancouver, where you clear U.S. customs in Canada. Well, and unlike Vancouver and what we do with the United States, where you can go across with one of those speed passports that allow you to go through. That's not the case. That's not the case with Australia? No. Australia is just like Europe? Just like all of the ---- Like France? Yes. Okay. Thank you. Thank you, Your Honor. We have some time for rebuttal. What about Judge Fischer's question about mediation? Is there any possibility or interest? I mean, we were talking about the child here, and I realize there are sort of concrete legal issues that don't necessarily make the child's best interest as their guiding consideration, because the custody, the family court is supposed to make that determination. Nevertheless, it's hard not to. It's sort of the elephant in the room, what happens to the child. And I was just thinking about following up on Judge Fischer's question. Do you think that there might be a place for mediation in this case in a way that minimizes what ---- One way or another, this is going to be hard on the child, whatever happens. Yes. I have to consult with my client on that issue, but I think ---- I understand. But there certainly may be a possibility on that. I think the concern that I have initially is we have a pattern of undertaking negotiations to try to come to situations whether it's visitation, custody, returning the child to Panama. With the child's best interest at heart and in mind, at the eleventh hour Mr. Joyce has a repeated tendency to evoke his agreement. So I think that's our concern. And certainly, I mean, I think the child should be returned to Panama. I would not like it very much if any of the parties did that here. Right. They would not be making points for the Court. I think on that I can speak. Although the contents of any mediation are confidential, but having a mediator involved can often tie things down much better if there's a third party in there who bears witness to the conduct. And it should be noted that Ms. Cuellar has always permitted prior to the abduction Mr. Joyce to have unmitigated access to his daughter, to visit his daughter. And I think there have been some recent events that raise concerns, frankly, as to her own safety with respect to Mr. Joyce. But I think it's fair to say that my client is appreciative of the fact that this child should have both parents in her life. But I also want to emphasize we're here to get the child back to her home country, which is where she belongs. Can I bring you back to that, then? Counsel cited the District Court's concern after hearing the testimony of your client that although he doesn't make a specific credibility finding at ER-22, he resolves the accident much differently from the way you were characterizing it. And that is he finds that it was a serious injury and that it led to ataxia. So what weight do we give that? I mean, that doesn't go to the issue of grave harm. And since he got to see, as Judge Kaczynski pointed out, this is somewhat unusual. In this case, he had both parents. The District Court had both parents in front of him and could assess credibility. What weight should we give that here on the serious harm? I think you should give it very little weight for the following reason. It's undisputed that the child had a single one-time accident. The District Court found that that one-time accident resulted in a condition called ataxia. And without briefs, we go through and explain why that finding was erroneous because it was based on numerous evidentiary errors. However, for the moment, let's put that aside and accept the finding as it is and just say the child had a single accident, she fell, and it resulted in a neurological impairment called ataxia which requires some treatment. That does not rise to grave risk of harm. There is not a single case that says a one-time accident based on negligence amounts to grave risk of harm. Every single case on grave risk of harm and every single example in the literature falls into basically two categories. One is where the non-abducting parent puts the child maliciously or intentionally. I take that point, but without prolonging it. Let's suppose that the District Court came to the conclusion that this mother has a natural desire to have the child, but that the mother is careless and in denial and that while this is only a single accident, it was a serious fall. You say, let's accept the fact that it produced a neurological injury and that the court is convinced based in part on the demeanor of the mother that because she denies the seriousness of it in her testimony, that to turn the child over to her and send her back to Panama is going to expose the child to a risk that this very kind of accident will happen again and that that is the risk of harm that is confronting the court as it judges whether or not to release this child to the mother. My response is that exact argument could be made to the Panamanian court deciding custody. Mr. Joyce can walk into that courthouse in Panama City and he can argue that my client is an unfit mother because of this one-time accident. Nothing is stopping him from doing that. He has every opportunity to do that. That is not what the grave risk of harm is supposed to cover. The fact that Ms. Cuellar may have been on watch when this one-time accident occurred, I don't think it shows that she's even an unfit mother, but I understand that that may be Mr. Joyce's position. But that is precisely the heart of a custody determination that should be made by the Panamanian authorities. They have the presumptive jurisdiction to make that determination. Is there any evidence in the record that, assuming she has this ataxia condition, that if she doesn't get medical – appropriate medical treatment for it, that it would deteriorate? No. And that she couldn't get appropriate medical treatment in Panama? No. Mr. Joyce's testimony, in fact, demonstrates the opposite. First of all, he only – he said he took the child to a neurologist. He didn't say the number of times he took the child to a neurologist. He never proffered any diagnosis from a physician, even the neurologist or the pediatrician who was supposedly keeping up with it. Rather, he proffered the opinion of a marriage counselor who specializes in intergenerational intimacy on this issue. And, in fact, he testified that it appears that her condition is getting better. So we have no evidence of the ongoing treatment program. We have no even diagnosis of the underlying injury. And we have no basis whatsoever to reasonably infer what the consequences may be of either a temporary or permanent interruption of that treatment program. You know, let's not forget that the Panamanian corpsman deciding custody may completely credit his view that she requires treatment and determines that the child should reside with him in the United States or should perhaps share time with the parents on that basis. So there's no reason, and there's certainly no basis in the record, just to conclude that the child requires treatment or that any interruption on a temporary or permanent basis would be a grave risk of harm to this child. I see my time is up, so if... Thank you. Thank you. Thank you. I'm sorry you have to stand so close. We are... Counsel for argument, both sides. We are adjourned.
judges: Kozinski, Fisher, Paez